

FILED

JUN 3 0 2004

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
           DEPUTY CLERK

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MAXIMUM COMFORT, INC., a
California corporation,

                                NO. CIV. S-03-1584 LKK/PAN

        Plaintiff,

    v.                         O R D E R

TOMMY G. THOMPSON, Secretary of
Health and Human Service of the     **TO BE PUBLISHED**
United States,

        Defendant.
_____/

    Plaintiff filed this complaint against the Secretary of the
United States Department of Health and Human Services, Tommy G.
Thompson ("Secretary"), seeking judicial review of a final
administrative decision made by the Medicare Appeals Council
("MAC") of the Department of Health and Human Services.  The matter
comes before the court on the parties' cross-motions for summary
judgment.  I decide the motions on the basis of the papers and
pleadings filed herein and after oral argument.

////                        73

1

# I.

## BACKGROUND

Plaintiff, Maximum Comfort, is a California corporation in the business of selling, leasing, and renting durable medical equipment ("DME").  Plaintiff supplies DME, including motorized wheelchairs, to Medicare and Medicaid beneficiaries throughout California, Oregon and Nevada.  Medicare reimburses Maximum Comfort for qualifying DME supplied to its beneficiaries.  To receive reimbursement, plaintiff must first submit invoices to and receive approval from CIGNA Healthcare, a private fiscal agent that has contracted with Medicare to process claims.

The dispute in this case concerns reimbursement claims for numerous motorized wheelchairs provided by plaintiff to Medicare beneficiaries.  CIGNA initially approved the claims for the motorized wheelchairs and Medicare accordingly provided plaintiff with reimbursement payments.  After CIGNA conducted an audit, however, it concluded that the wheelchairs did not qualify for coverage and that Medicare had therefore overpaid plaintiff.  Consequently, CIGNA began recouping the payments for the disqualified claims by offsetting plaintiff's Medicare account.  Plaintiff challenged CIGNA's decision and exhausted the appeals process.  In the final administrative hearing, the MAC concluded that the wheelchairs could not be paid for by Medicare because plaintiff had insufficiently documented the medical necessity of the wheelchairs.

////

1   **A.   PROCEDURAL HISTORY**

2        This case was first heard by this court on October 20,

3   2003, pursuant to plaintiff's motion for a preliminary injunction.

4   On October 22, the court issued an order explaining that the

5   parties had failed to address certain critical issues and directed

6   them to file supplemental briefing.  In that same order, the court

7   enjoined the defendant from "[r]ecouping, offsetting or otherwise

8   collecting from plaintiff any alleged overpayments for any of the

9   beneficiaries which are the subject of this action from any amounts

10  due and owing to plaintiff and from failing to pay such amount when

11  due."  Order at 3.  The parties filed their supplemental briefing

12  and then filed cross-motions for summary judgment.  In due course,

13  a hearing was set and oral argument was heard on the cross-motions.

14  This opinion disposes of all of the pending matters before the

15  court.

16  **B.   THE MEDICARE PROGRAM**

17       The Medicare Act, established under Title 18 of the Social

18  Security Act, 42 U.S.C. §§ 1395-1395gg, pays for covered medical

19  care provided to eligible aged and disabled persons.  The Medicare

20  Program is administered by the Centers for Medicare and Medicaid

21  Services ("CMS"), a component of the United States Department of

22  Health and Human Services ("HHS").[1]

23  ////

24  _____

25       [1]  CMS was formerly known as the Health Care Financing
    Administration ("HCFA").  See 66 Fed. Reg. 36583, 36584 (July 12,
26  2001).

The Medicare Act consists of three main parts:  Part A, which generally authorizes payment for covered inpatient hospital care and related services, 42 U.S.C. §§ 1395c to 1395i-5, 42 C.F.R. Part 409; Part B, which provides supplementary medical insurance for covered medical services and equipment, 42 U.S.C. §§ 1395j to 1395w-4, 42 C.F.R. Part 410; and Part C, which authorizes beneficiaries to obtain covered services through HMOs and other "managed care" arrangements, 42 U.S.C. §§ 1395w-21 to 1395w-28, 42 C.F.R. Part 422.

This case involves Part B of the Medicare Act.  Part B resembles "a private medical insurance program that is subsidized in major part by the federal government."[2]  <u>Schweiker v. McClure</u>, 456 U.S. 188, 190 (1982).  Coverage under this part extends to DME, including wheelchairs used in a patient's home.  42 U.S.C. §§ 1395k, 1395x(s), 1395x(n); 42 C.F.R. § 410.38(a)-(c).  As with private medical insurance programs, the statute and its implementing regulations establish conditions and limitations on the coverage of services and equipment, 42 U.S.C. §§ 1395k, 1395l, 1395x(s), and provide for exclusions from coverage.  42 U.S.C. § 1395y(a)(2)-(16); 42 C.F.R. § 411.15(a)-(j).  In all cases, Medicare coverage is limited to services that are medically "reasonable and necessary" for the diagnosis or treatment of illness.  42 U.S.C. § 1395y(a)(1)(A); 42 C.F.R. § 411.15(k)(1).

---

[2]  Part B participants pay monthly premiums that are deposited along with federal appropriations in the Federal Supplementary Medical Insurance Trust Fund which finances Part B.  <u>See</u> 42 U.S.C. §§ 1395j, r, s, t, w.

C.   **MEDICARE CARRIERS**

In administering Part B, CMS acts through private fiscal agents called "carriers."  42 U.S.C. § 1395u; 42 C.F.R. Part 421, Subparts A and C; 42 C.F.R. § 421.5(b).  Carriers are entities that, under contract with the Secretary, perform a variety of functions including making coverage determinations, determining reimbursement rates and allowable payments, conducting audits of the claims submitted for payment, and rejecting or adjusting payment requests.  Claims for DME, prosthetics, and orthotics are processed by designated regional carriers called Durable Medical Equipment Regional Carriers ("DMERCs").  42 U.S.C. §§ 1395m, 1395u; 42 C.F.R. § 421.210.  At all relevant times, the DMERC for Maximum Comfort was CIGNA HealthCare ("CIGNA").

One of the carrier's duties is to conduct post-payment audits to ensure that payments are made in accordance with applicable Medicare payment criteria.  When payment is made erroneously, an "overpayment" is assessed and "recouped" from subsequent payments due to the DME supplier.[3]  42 C.F.R. § 421.200(a)(2); see also 42 U.S.C. §§ 1395g(a), 1395l(j), 1395gg(b)(1); 42 C.F.R. §§ 405.370, 405.371(a)(1),(2), 405.350.  The Act provides for relief from liability for a supplier when it is determined that the supplier "did not know, and could not reasonably have been expected to know, that payment would not be made for a service in question."

---

[3]  Recoupment is defined as "[t]he recovery by Medicare of any outstanding Medicare debt by reducing the present or future Medicare payments and applying the amount withheld to the indebtedness."  42 C.F.R. § 405.370.

42 U.S.C. § 1395pp(a).

**D.   DURABLE MEDICAL EQUIPMENT SUPPLIERS**

Private businesses selling health care items and products may enter into agreements with the Secretary to become participants in the Medicare program.  See 42 U.S.C. § 1395u(h)(1).  Once participants, these business, identified by Medicare as suppliers, can provide hardware to Medicare beneficiaries.  Beneficiaries execute an assignment of benefits to the supplier so that it may be reimbursed for the service by Medicare.[4]  See 42 U.S.C. § 1395u(b)(3)(B).  A prerequisite for receipt of reimbursement is submitting a Certificate of Medical Necessity (CMN) to the Carrier.  See 42 U.S.C.§ 1395m(j)(2)(A).

## II.

## FACTS

On April 3, 2000, CIGNA audited 30 of the 236 power-operated wheelchair claims submitted by plaintiff from its Redding store between January 1, 1998 and January 22, 1999.  Administrative Record (A.R.) Vol. 6 at 1585.  This audit, identified as the "Hayes group" audit,[5] resulted in a determination that plaintiff failed to provide sufficient medical information, including patients'

---

[4]   Under an assignment agreement, the beneficiary transfers his right to payment to the supplier.  A supplier who accepts assignment agrees to accept, as full satisfaction, the amount the carrier determines to be the reasonable charge.  See 42 U.S.C. § 1395u(b)(3)(B)(ii); 42 C.F.R. § 424.55.

[5]   Brenda Hayes was the designated lead Medicare beneficiary in the Administrative Law Judge's review of this group of claims audit, referred to as the 'Hayes group' claims throughout the record.

1    medical records, to substantiate the medical necessity of 22

2    reimbursement claims.  As a result, CIGNA concluded that Maximum

3    Comfort was overpaid a total of $ 640,457.01.[6]  Id. at 1595.  CIGNA

4    subsequently received additional documentation from the plaintiff,

5    reducing the number of problematic claims to 19 and the overpayment

6    amount to $ 548,555.04.  Id. at 1634.

7         On September 14, 2000, CIGNA notified plaintiff that it

8    conducted a second audit of a sample number of the 182 Medicare

9    claims submitted by plaintiff from its Sacramento store between

10   July 1, 1998 and July 2, 1999.  A.R. Vol. 5 at 1275.  This second

11   audit, known as the "Torres group,"[7] resulted in a determination

12   that plaintiff was overpaid $237,229.11.  A.R. Vol. 4 at 1180.[8]

13   CIGNA determined that the claims did not qualify for reimbursement

14   because, although plaintiff submitted the required CMN for each

15   claim in the Hayes and Torres groups, it failed to provide

16   *additional* medical documentation to establish the medical necessity

17   and reasonableness of the motorized wheelchairs.  A.R. Vol. 5 at

18   1251; A.R. Vol. 6 at 1585.

19   ////

---

21   [6]  CIGNA used a method it refers to as "extrapolation" to
     project the overpayments of the 22 claims to the balance of the 236
22   claims to arrive upon an original overpayment assessment of
     $640,457.01.

23   [7]  Elizabeth Torres was the designated lead Medicare
     beneficiary in the Administrative Law Judge's review of this group
24   of claims, referred to as the "Torres group" throughout the record.

25   [8]  The original overpayment assessment was in the amount of
     $308,383.50, but was subsequently reduced to $237,229.11.  A.R.
26   Vol. 4 at 1181; A.R. Vol. 5 at 1275-1279.

7

Plaintiff challenged both of the overpayment assessments through CIGNA's in-house administrative appeals process, but did not prevail. A.R. Vol. 3 at 572; A.R. Vol. 5 at 1335; see 42 C.F.R. §§ 405.815, 405.821. It then appealed CIGNA's decisions. A.R. Vol. 1 at 20, 22; see 42 C.F.R. § 405.855. Two different Administrative Law Judges (ALJs) issued almost identical decisions in plaintiff's favor, concluding that, as a supplier, plaintiff was only required to submit a CMN to establish the medical necessity and reasonableness of each wheelchair it provided. They further concluded that the Secretary did not have the authority to require that Maximum Comfort provide patient medical records to support medical necessity. A.R. Vol. 2 at 00451; A.R. Vol. 4 at 4.

By notices dated March 21 and November 20, 2001, the MAC notified plaintiff of its determination to review the ALJs' decisions. A.R. Vol. 1 at 21-22; see 20 C.F.R. § 404.969. The MAC's purpose in reviewing the ALJs' decisions was to determine the type of documentation plaintiff was required to obtain and keep to support the medical reasonableness and necessity of the DME it supplied to Medicare beneficiaries. A.R. Vol. 1 at 21, 24.

On June 11, 2003, the MAC issued its opinion reversing the ALJs' decisions that a CMN is the only required medical necessity documentation and reinstating the denial of reimbursement. Citing § 1834(j)(2)(B) of the Social Security Act, 42 U.S.C. § 1395m(j)(2)(B), the MAC recognized that Congress established that "a CMN is a form containing information to assist the carrier in

determining whether an item is medically reasonable and necessary."
A.R. Vol. 1 at 26.  It limited the significance of that definition,
however, claiming that such language was included only in reference
to certain restrictions Congress placed on the type of information
that suppliers could provide on the CMN.  Id. at 26-27.  It then
stated that it could not conclude that Congress intended the CMN
to be the sole mechanism establishing the coverage of DME, or that
the Secretary, through his Carriers, cannot establish additional
medical documentation requirements.  Id.  Based on that reasoning,
it concluded that, although plaintiff provided a CMN for each
claim, it was also required to submit any other medical necessity
documentation as prescribed by the Secretary or his delegates.

        The MAC then turned to several manuals and newsletters issued
by CIGNA to DME suppliers to determine what medical necessity
documents plaintiff was required to provide during the period in
question.   Adverting to various sections of those materials, it
determined that the manuals and newsletters contained
pronouncements requiring that plaintiff keep on file and submit
beneficiaries' medical records and making it "responsible for
[reviewing the records and] making a judgment as to whether the
service [was] medically necessary."[9]  A.R. Vol. 1 at 28.  Because

_____

        [9]  The MAC relied upon language in a March 1997
newsletter, the "DMERC Dialogue - Region D," providing that
"a supplier, by virtue of its furnishing a DMEPOS item to a
medicare beneficiary, is responsible for making a judgment
as to whether the service is medically necessary, and for
assigned claims, for informing the beneficiary prior to
furnishing the item, of the likelihood of Medicare denial of

1  plaintiff only provided a CMN, the MAC concluded that it failed to
2  meet all documentation requirements.  Accordingly, the MAC
3  determined that plaintiff had not provided the required
4  documentation to establish that the wheelchairs were reasonable and
5  medically necessary as contemplated by the Act, and that it had
6  therefore been overpaid by Medicare.  A.R. Vol. 1 at 17-39.

7                              **III.**

8                           **STANDARDS**

9       The Medicare Act provides for judicial review of final
10  decisions by the Secretary of Health and Human Services
11  regarding benefits paid under Medicare B.  See 42 U.S.C.
12  § 1395ff(a),(b).  The reviewing court may affirm, modify, or
13  reverse the final decision of the Secretary.  42 U.S.C. § 405(g)
14  (incorporated by reference in 42 U.S.C. § 1395ff(b)(1)(a)).

15      Review of the Secretary's decision is governed by the
16  Administrative Procedure Act, 5 U.S.C. §§ 701-706, which
17  provides that the Agency's decision will be set aside only if it
18  is "arbitrary, capricious, an abuse of discretion, or otherwise
19  not in accordance with law . . . or unsupported by substantial
20  evidence." 5 U.S.C. § 706(2)(A),(E); see also French Hosp. Med.
21  Ctr. v. Shalala, 89 F.3d 1411, 1416 (9th Cir. 1996).  Because
22  the parties agree that the facts are restricted to the

23

24

25  _____

26  payment on the basis that the item is not reasonable and
    necessary."  A.R. Vol. 1 at 28 (emphasis added).

administrative record,[10] the sole issue is one of law., i.e. whether the MAC's determination of the scope of a provider's obligation relative to documenting medical necessity is legally proper.

A court's review of an agency's construction of a statute which it is charged with administering involves a now familiar two step process.  First, it must determine whether the statute speaks directly to the issue; if so, no further construction is required. <u>Chevron U.S.A. Inc. v. Natural Resources Defense Council Inc.</u>, 467 U.S. 842.  That is because, "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." <u>Id.</u>  On the other hand, if the court concludes that "the statute is silent or ambiguous," it must determine "whether the agency's answer is based on a permissible construction of the statute." <u>Id.</u>

The manner in which the agency supplies construction of the statute is within its discretion.  <u>Cmty. Hosp. of Monterey Peninsula v. Thompson</u>, 323 F.3d 782, 790 (9th Cir. 2003).  Thus, it is not necessary that the agency promulgate regulations, but it may properly determine benefits under the Medicare Act by

---

[10]   While there are limited circumstances in which the District Court may receive information extrinsic to the administrative record, see <u>Occidental Engineering Co. v. INS</u>, 753 F.2d 766, 769-70 (9th Cir. 1985)(citing <u>Citizens to Preserve Overton Park v. Volpe</u>, 401 U.S. 402, 415 (1971)), in the matter at bar, there has been no indication by any party that receipt of extrinsic evidence and <u>de novo</u> fact-finding by the court is appropriate.

1  relying upon both the rule making and the adjudicative process.

2  Id. "It is, thus, well settled that, if the Secretary fills a

3  gap that he is authorized to fill, his resolution in the course

4  of formal adjudication of the kind we review is controlling

5  unless arbitrary, capricious, or manifestly contrary to the

6  statute." Id.[11] While an agency may construe statutes through

7  the adjudicative process, due process may restrain retroactive

8  application of a construction which adversely affects a

9  provider's right to reimbursement. See Covey v. Hollydale

10  Mobilehome Estates, 116 F.3d 830 (9th Cir. 1997).

11                              IV.

12                           ANALYSIS

13        The issue tendered is whether the Secretary may require

14  that plaintiff, as a DME supplier, obtain and submit medical

15  documentation in addition to the CMN to prove the medical

16  necessity and reasonableness of the motorized wheelchairs it

17  supplied to Medicare beneficiaries.[12]

18  _____

19        [11] "A decision is arbitrary and capricious if the agency
    'has relied on factors which Congress has not intended it to
20  consider, entirely failed to consider an important aspect of the
    problem, offered an explanation for its decision that runs counter
21  to the evidence before the agency, or is so implausible that it
    could not be ascribed to a difference in view or the product of
22  agency expertise.'" O'Keeffe's, Inc. v. United States Consumer
    Prod. Safety Comm'n, 92 F.3d 940, 942 (9th Cir. 1996) (quoting
23  Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463
    U.S. 29, 43 (1983)).

24        [12] A second issue was whether plaintiff was required to make
    an independent determination of medical necessity.  While that
25  issue is discussed in the body of this opinion, as the court
    understands it, the MAC's determination of overpayment essentially
26  rested upon the failure to obtain documentation beyond the CMN.

**A.   THE PARTIES' CONTENTIONS**

The Secretary asserts that the MAC correctly concluded that he is vested with the authority to promulgate rules regarding the type of documentation required to determine the medical necessity of DME.  He maintains that neither the Medicare Act nor the implementing regulations establish the CMN as the sole document to demonstrate that an item is medically reasonable and necessary.  Def's Br. in Supp. of Mot. for Summ J. at 15.  Rather, he argues, "Congress has granted the Secretary very broad discretion to determine the documentation required to establish medical necessity . . . ." Id. at 2.  He asserts that it was pursuant to this authority that he required that "[a] CMS must be substantiated by the patient's relevant medical records."  Def's Supplemental Br. at 4.

The Secretary argues that the court must give deference to the MAC's decision because the medical necessity documentation requirements were created under his authority and are not "inconsistent with the statute or regulations or . . . an unreasonable implementation of them."  Def's Br. in Opp'n. to Pl's Mot. for Prelim. Inj. at 16.  Accordingly, he claims plaintiff was properly required to obtain the beneficiaries' medical records, review them, and make a judgment as to whether the wheelchairs at issue were medically necessary.

Plaintiff, on the other hand, argues that the MAC's decision improperly imposed documentation requirements, and maintains that its only obligation under the Medicare Act to

show that the wheelchairs it provided were medically necessary was to keep on file and provide a CMN.  Pl's Br. in Supp. of Mot. for Summ. J. at 4.  Plaintiff insists that it abided by this requirement when it sought reimbursement for the motorized wheelchairs by providing CIGNA with a CMN for each claim.

Plaintiff advances two arguments to support its contention that the Secretary's underlying decision is unfounded.  First, it contends that the Secretary simply does not have the authority to create rules or regulations requiring medical necessity documentation in addition to the CMN.  Pl's Br. in Supp. of Mot. for Summ. J. at 3.  Second, it asserts that, even if the Secretary did have the authority, any such rules would not be binding upon it because CIGNA did not provide it with adequate notice of the new documentation requirements.

**B.   THE SECRETARY'S AUTHORITY**

The resolution of this case turns on whether Congress has directly spoken on medical necessity documentation requirements, or whether it explicitly or implicitly delegated the task to the Secretary, vesting him with discretion to establish the challenged requirements.  As I explain below, a review of the statute demonstrates that, contrary to the Secretary's contentions, there is no gap left by Congress for the Secretary to fill regarding medical necessity documentation.

To resolve the issues in dispute, I must "look first to the plain language of the statute, construing the provisions of the entire law, including its object and policy, to ascertain the

14

1  intent of Congress."  <u>Carson Harbor Vill. Ltd. v. Unocal Corp</u>.,

2  270 F.3d 863, 877 (9th Cir. 2001) (en banc)(internal citations

3  omitted).  As the High Court instructed, '"the meaning of a

4  statute must, in the first instance, be sought in the language

5  in which the act is framed, and if that is plain, . . . the sole

6  function of the courts is to enforce it according to its

7  terms.'"  <u>Id.</u> at 878 (quoting <u>Caminetti v. United States</u>, 242

8  U.S. 470, 485 (1917)).

9      Put directly, here Congress addressed the issue of medical

10 necessity documentation in 42 U.S.C. § 1395m(j).  That section

11 provides that a "'certificate of medical necessity' means a form

12 or other document containing information required by the carrier

13 to be submitted to show that an item is reasonable and necessary

14 for the diagnosis or treatment of illness or injury or to

15 improve the functioning of a malformed body member."  42 U.S.C.

16 § 1395m(j)(2)(B).[13]  The Secretary's contention that Congress

17 _____

18       [13]   The Act also specifies what the CMN shall contain:

19 (2) Certificates of medical necessity
   (A) Limitation on information provided by suppliers on certificates
   of medical necessity

20 (i) In general
   Effective 60 days after October 31, 1994, a supplier of medical

21 equipment and supplies may distribute to physicians, or to
   individuals entitled to benefits under this part, a certificate of

22 medical necessity for commercial purposes which contains no more
   than the following information completed by the supplier:

23

24 (I) An identification of the supplier and the beneficiary to whom
   such medical equipment and supplies are furnished.
   (II) A description of such medical equipment and supplies.

25 (III) Any product code identifying such medical equipment and
   supplies.

26 (IV) Any other administrative information (other than information

15

provided him with the authority to decide what documentation may

be required to determine the medical necessity of DME conflicts

with the plain meaning of § 1395m(j)(2)(B).  That section

plainly specifies that Congress intended that whatever

information may be required by carriers from suppliers to show

the medical necessity and reasonableness of DME must be

contained in a CMN.  As I explain below, the CMN complies with

§ 1395m(j)(2)(B); moreover, any deficiency in the CMN now in use

is easily corrected administratively.

The CMN is created and approved by CMS and is comprised of

four sections.  Section A solicits identifying information of

the supplier, beneficiary, and physician, as well as other

administrative information.  A.R. Vol. 4 at 860-861.  Section B

contains a series of questions to be completed by the

_____

relating to the beneficiary's medical condition) identified by the Secretary.

(ii) Information on payment amount and charges

If a supplier distributes a certificate of medical necessity containing any of the information permitted to be supplied under clause (I), the supplier shall also list on the certificate of medical necessity the fee schedule amount and the supplier's charge for the medical equipment or supplies being furnished prior to distribution of such certificate to the physician.

(iii) Penalty

Any supplier of medical equipment and supplies who knowingly and willfully distributes a certificate of medical necessity in violation of clause (I) or fails to provide the information required under clause (ii) is subject to a civil money penalty in an amount not to exceed $1,000 for each such certificate of medical necessity so distributed. The provisions of section 1320a-7a of this title (other than subsections (a) and (b) of such section) shall apply to civil money penalties under this subparagraph in the same manner as they apply to a penalty or proceeding under section 1320a-7a(a) of this title.

42 U.S.C. § 1395m(j)(2)(A).

16

beneficiary's ordering physician.  According to the instructions

for completing the CMN, Section B "is used to gather clinical

information to determine medical necessity."  Id. at 861.

Section C of the CMN requires the supplier to provide a

narrative description of the equipment and the cost thereof.

Id.  Finally, section D provides for the physician's attestation

and signature.  Id. at 860.  The instructions explain that the

physician's signature "certifies the items ordered are medically

necessary for [the] patient."  Id. at 861.[14]  The CMN thus

complies with Congress' mandate that whatever clinical

information the carrier determines is required to determine the

medical necessity of motorized wheelchairs must be gathered

using the CMN.  Given the above, no room is left for requiring

further documentation.

Despite the Congressional specification of the function of

the CMN, the Secretary cites to 42 U.S.C. § 405(a) to support

his position that he properly required plaintiff to provide

beneficiaries' medical records.  I cannot agree.

Section 405(a) provides that the Secretary "shall have full

power and authority to make rules and regulations and to

establish procedures" to carry out the provisions of the Act.

42 U.S.C. § 405(a).  This authority, however, does not mean that

_____

[14]    The physician's signature "certifies that the medical
necessity information . . . is true, accurate and complete, . . .
and [that the physician] understand[s] that any falsification,
omission, or concealment of material fact in [section B] may
subject [the physician] to civil or criminal liability."  A.R. Vol.
4 at 861.

1   he has the authority to create rules that are at odds with the

2   plain language of the statute.   Pub. Employees Ret. Sys. of Ohio

3   v. Betts, 492 U.S. 158, 171 (1989)("[N]o deference is due to

4   agency interpretations at odds with the plain language of the

5   statute itself.").   Section 405(a) cannot be read to permit the

6   Secretary to create requirements that undermine both the plain

7   text of the statute and Congressional intent.

8        Defendant presents three arguments in support of his

9   contention.   None are persuasive.   First, the Secretary argues

10  that because he is vested with the authority to determine what

11  criteria must be met for an item to be medically reasonable and

12  necessary, he must also be vested with the authority to

13  determine the mechanisms by which suppliers prove that criteria.

14  Second, he submits that the CMN is not sufficient to provide the

15  required information to demonstrate medical necessity because

16  Congress restricted the type of information that suppliers may

17  provide on it.   Lastly, he argues that the plaintiff was

18  required to submit additional medical necessity information

19  because the CMN does not request enough information to address

20  all the criteria for motorized wheelchairs.   I address each

21  argument in turn.

22       The premise of the Secretary's chief argument is that he is

23  authorized to determine the type of medical necessity

24  documentation by virtue of his authority to determine medical

25  necessity criteria.   Defendant correctly asserts that Congress

26  granted him broad discretion over the criteria required to prove

18

1 medical necessity and reasonableness.  Nonetheless, as I note

2 below, Congress did not provide the Secretary with the same

3 discretion regarding the type of documentation which suppliers

4 must provide.

5      Congress vested exclusive and final authority in the

6 Secretary to decide what criteria must be met for a particular

7 item or service to qualify as medically necessary, and

8 accordingly, to be reimbursable under Medicare.  42 U.S.C.

9 § 1395ff(a); 42 U.S.C. § 1395y(a)(1)(A).  42 U.S.C. § 1395x(n)

10 provides that power-operated wheelchairs may be covered "where

11 the use of such a vehicle is determined to be necessary on the

12 basis of the individual's medical and physical condition . . .

13 as the Secretary may prescribe."  In Heckler v. Ringer, the High

14 Court emphasized that "[t]he Secretary's decision as to whether

15 a particular medical [item] is 'reasonable and necessary'" is

16 "clearly" within his discretion.  466 U.S. 602, 617 (1984).

17      Exercising this authority, the Secretary has promulgated

18 regulations establishing criteria to be used in determining the

19 medical necessity and reasonableness of motorized wheelchairs.

20 Section 410.38 of Title 42 of the C.F.R. provides that

21 wheelchairs must be used in the patient's home or in an

22 institution that is used as a home, that power-operated

23 wheelchairs must be "necessary on the basis of the individual's

24 medical and physical condition," and "[m]eet any safety

25 requirements specified by CMS."  42 C.F.R. 410.38.  The

26 Secretary asserts that the Carrier's manuals and newsletters

contain further medical necessity criteria.[15]  Def's Br. in Supp.
of Mot. for Summ. J. at 6.  Specifically, he points to the
"DMERC Region D Supplier Manual" issued in December of 1993
which provides that power-operated wheelchairs are covered if:
(1) the beneficiary would otherwise be bed or chair confined,
(2) the wheelchair is medically necessary and the patient is
unable to operate the wheelchair manually, and (3) the
beneficiary is capable of safely operating the power wheelchair.
Id.; A.R. Vol. 1 at 52.[16]

The Secretary reasons that, because he has prescribed
medical necessity criteria for wheelchairs, "providers and
suppliers must follow the uniform . . . documentation
requirements set forth in [the] carrier issuances . . . ."
Def's Br. in Supp. of Mot. for Summ. J. at 15.  He avers that
his discretion to determine the medical necessity of an item
"includes the right to determine the level of documentation
necessary to substantiate that an item of durable medical
equipment furnished to a Medicare beneficiary is reasonable and
medically necessary."  Def's Br. in Opp'n to Pl's Mot. for
Prelim. Inj. at 5.  This analytical leap has some initial
appeal, and if Congress was silent, might well be persuasive.

---

[15]  The MAC's decision did not discuss the legal sufficiency
or weight of the Carrier manuals and newsletters.  Given the
court's disposition, I need not address that issue.

[16]  Plaintiff, quite properly, does not dispute the
Secretary's authority or ability to prescribe the medical necessity
criteria for the motorized wheelchairs it provided to Medicare
beneficiaries.

The fact is, however, that the argument simply cannot stand in light of the fact that Congress has directly spoken to the issue.  Put another way, while it is clear that Congress vested the Secretary with the discretion to determine medical necessity criteria, it does not inexorably follow that Congress concurrently granted him the authority to determine the type of documentation required to satisfy that criteria.  Indeed, it is clear that Congress did not do so.

It is true that Congress explicitly provided the Secretary with authority to determine medical necessity criteria. Importantly, however, Congress not only omitted similar language pertaining to medical necessity documentation, it determined this issue itself in creating and defining the CMN, thereby leaving no gap for the Secretary to fill.

"In construing a statute, we begin with the understanding that Congress says in a statute what it means and means in a statute what it says there."  In re Price, 353 F.3d 1135, 1140 (9th Cir. 2004) (internal quotations and citations omitted).  It is plain from the Medicare Act that Congress meant for the Secretary to determine medical necessity and that the required information to make that determination be contained in a CMN. Accordingly, the plain language of the statute forecloses the Secretary's first argument.

I now examine the Secretary's second argument tendered in support of his position.  That argument asserts that §1833(e) of the Act, 42 U.S.C. § 1395l(e), provides the Secretary with the

21

1  authority to create the disputed medical necessity documentation
2  requirements in his discretion.  Again, I cannot agree.

3  Section 1395l(e) provides that "[n]o payment shall be made
4  to any provider of services . . . under this part unless there
5  has been furnished such information as may be necessary in order
6  to determine the amounts due such provider . . . ."  42 U.S.C. §
7  1395l(e).  The Secretary asserts that the MAC correctly
8  concluded that the requirement that a DME supplier maintain
9  "'medical documentation[,] in addition to the CMN in the
10 supplier's records, . . . is consistent with §1833(e) of the
11 Act, which requires suppliers to furnish sufficient information
12 to support payments under Part B.'"  Def's Br. in Opp'n to Pl's
13 Prelim. Inj. at 15; A.R. Vol. 1 at 29.  The Secretary asserts
14 that the statute implicitly grants him the discretionary
15 authority to create medical necessity documentation requirements
16 in order to determine whether a particular item may be
17 reimbursed.  The Secretary's focus on the opening language of
18 the section is too narrow.  As the balance of the statute
19 demonstrates, the statute's provision addresses "determin[ing]
20 the *amounts* due such provider . . . ."  42 U.S.C § 1395l(e)
21 (emphasis added).  Read in its entirety, it is apparent that
22 this section concerns information which the Secretary may
23 require to ascertain the monetary amount due for covered items,
24 and has no bearing on the determination of medical necessity.

25 The Secretary's reliance on Cmty. Hosp. of Monterey
26 Peninsula v. Thompson, 323 F.3d 782 (9th Cir. 2003), to

22

1  demonstrate that § 1395l(e) provides him with discretion to

2  create medical necessity documentation requirements is

3  unavailing.   That decision addressed the means of ascertaining

4  the amount due a provider.   The Circuit quite correctly

5  concluded that the plain text made it clear that "Congress

6  expected the Secretary to resolve" billing issues and the

7  requirements placed on providers relative to that issue had been

8  properly created pursuant to his discretionary power.   Id. at

9  789.   The court explained that §§ 1395g(a) and 1395x(v)(1)(A) of

10 Title 42 of the United States Code explicitly provided the

11 Secretary with such authority.   Id. at 789-790.   Those two

12 sections provide that the Secretary shall determine the

13 reimbursement amount of a given service by, inter alia,

14 considering the cost actually incurred to the provider and

15 establishing methods to be used in computing the amount of

16 payment.[17]   In sum, the portion of the Act addressed in Cmty.

---

17

18      [17]  42 U.S.C. § 1395x(v)(1)(A) provides, in relevant
part, that:

19      The reasonable cost of any services shall be the cost
actually incurred, excluding therefrom any part of incurred
20 cost found to be unnecessary in the efficient delivery of
needed health services, and shall be determined in accordance
21 with regulations establishing the method or methods to be
used, and the items to be included, in determining such costs
22 for various types or classes of institutions, agencies, and
services; . . .   the Secretary shall consider, among other
23 things, the principles generally applied by national
organizations or established prepayment organizations (which
24 have developed such principles) in computing the amount of
payment, to be made by persons other than the recipients of
25 services, to providers of services on account of services
furnished to such recipients by such providers. . . . Such
26

1  <u>Hosp</u>. instructs the Secretary to create regulations regarding

2  the determination of the amount due to providers for services

3  and the methods by which to make that determination.   The Ninth

4  Circuit's opinion, limited to the issue of billing requirements,

5  is clearly distinct from the question presented here.   Indeed,

6  <u>Cmty. Hosp.</u> indirectly supports the plaintiff's position.

7      The sections of the statute at issue in <u>Cmty. Hosp.</u> are

8  ───────────────────

9  regulations shall (i) take into account both direct and
   indirect costs of providers of services (excluding therefrom
10 any such costs, including standby costs, which are determined
   in accordance with regulations to be unnecessary in the
11 efficient delivery of services covered by the insurance
   programs established under this subchapter) in order that,
12 under the methods of determining costs, the necessary costs
   of efficiently delivering covered services to individuals
13 covered by the insurance programs established by this
   subchapter will not be borne by individuals not so covered,
14 and the costs with respect to individuals not so covered will
   not be borne by such insurance programs, and (ii) provide for
15 the making of suitable retroactive corrective adjustments
   where, for a provider of services for any fiscal period, the
16 aggregate reimbursement produced by the methods of
   determining costs proves to be either inadequate or
17 excessive.

18 42 U.S.C. § 1395g(a) provides that:

19     The Secretary shall periodically determine the amount
   which should be paid under this part to each provider of
20 services with respect to the services furnished by it, and
   the provider of services shall be paid, at such time or times
21 as the Secretary believes appropriate . . . and prior to
   audit or settlement by the General Accounting Office, from
22 the Federal Hospital Insurance Trust Fund, the amounts so
   determined, with necessary adjustments on account of
23 previously made overpayments or underpayments; except that no
   such payments shall be made to any provider unless it has
24 furnished such information as the Secretary may request in
   order to determine the amounts due such provider under this
25 part for the period with respect to which the amounts are
   being paid or any prior period.
26

akin to § 1395l(e), relied upon by the Secretary here.  Like
§§ 1395g(a) and 1395x(v)(1)(A), § 1395l(e) also explicitly
provides the Secretary discretion to determine the monetary
amount due to a supplier for qualifying DME.  Significantly,
however, while Congress vested the Secretary with authority
over medical necessity criteria and billing requirements, it
did not include language in the Act delegating the same
authority concerning medical necessity documentation, but
chose to speak on that subject itself.  Unlike billing
matters, Congress did not leave a gap for the Secretary to
fill regarding medical necessity documentation; instead, it
specifically provided that whatever information is required
to determine the medical necessity of DME is to be contained
in a CMN.  The Secretary's contention that § 1395l(e)
provides him with discretion to create the requirement in
question is based on an impermissible reading of the statute.

Lastly, I address the Secretary's claim that it may
require that DME suppliers obtain and provide Medicare
beneficiaries' medical records because "[i]t is not possible
for a CMN to fully describe the medical necessity of DME."
Def's Br. in Supp. of Mot. for Summ. J. at 15.  The Secretary
asserts that because "the Act places strict limitations on
the kind of information a supplier may ask a physician to
provide in a CMN," beneficiaries' medical records are
necessary to substantiate the medical necessity of DME.  Id.

1 at 15-16.  Below, I explain why the argument fails.[18]

2     Part B of the Act places limits on suppliers' use of a
3 CMN, but does not in any way restrict the type or amount of
4 medical information that *physicians* may be required to
5 include in it.  See 42 U.S.C. § 1395m(j)(2)(A)(I).[19]  While
6 the statute provides that the *supplier* cannot complete the
7 portion of the CMN relating to the beneficiary's medical
8 condition, but is strictly limited to providing
9 administrative information, nothing in that section supports
10 the Secretary's argument that Congress limited the type of
11 medical condition information in a CMN that may be provided
12 by others.

13     The Secretary also argues that plaintiff must obtain,
14 review, and provide medical records to prove the medical

15 _____

16     [18]  I am compelled to observe that if the Secretary is right,
his relief comes not from applying a construction of the statute
17 which is inconsistent with its plain meaning; rather, his relief
is to be sought by legislative action.
18
     [19]  The statute provides, in pertinent part that:
19
     ". . . a supplier of medical equipment and supplies may
20     distribute to physicians . . . a Certificate of Medical
     Necessity  .  .  .  which contains no more than the
21     following information *completed by the supplier*: (I) An
     identification of the supplier and the beneficiary to
22     whom such medical equipment and supplies are furnished.
     (II)  A  description  of  such  medical  equipment  and
23     supplies.   (III) Any product code identifying such
     medical  equipment  and  supplies.    (IV)  Any  other
24     administrative  information  (other  than  information
     relating  to  the  beneficiary's  medical  condition)
25     identified by the Secretary . . .."

26 42 U.S.C. § 1395m(j)(2)(A)(i)(emphasis added).

necessity of power wheelchairs and other DME.  According to

the Secretary, Congress placed the limitations listed in

§ 1395m(j)(2)(A), and created penalties for violations of

that section, because of concern with fraudulent and abusive

practices by DME suppliers.  Def's Br. in Supp. of Mot. for

Summ. J. at 15-16; A.R. Vol. 1 at 27.[20]  According to the

Secretary, these policy considerations place limits on the

medical information that a supplier may obtain from a

physician on a CMN.  On that basis, the Secretary contends

that he must have the authority to create other documentation

requirements so that he may determine when DME may be

reimbursed by Medicare, while at the same time being mindful

of Congressional intent to curb supplier fraud.

The argument is less than pellucid.  I have already

noted that the statute does not limit physician-supplied

information.  Moreover, it is unclear how such policy

considerations allow or require that suppliers obtain medical

records to support and make a judgment about the medical

necessity of DME.  The Secretary fails to explain why, if

Congress was concerned with supplier misconduct, and

accordingly strictly restricted suppliers to providing

administrative information, it would agree to allow suppliers

to "request copies of the customer's medical and clinical

---

[20]   Indeed, Congress provided that suppliers who violate the
restrictions enumerated in § 1395m(j)(2)(A)(i) are subject to
monetary penalties of up to $1,000 per violation.  See 42 U.S.C.
§ 1395m(j)(2)(A)(iii).

1  records substantiating the doctor's CMNs and review them for

2  . . . completeness and reasonableness."   Def's Br. in Opp'n

3  to Pl's Prelim. Inj. at 12; A.R. Vol. 1 at 28-29.   Indeed, it

4  appears to this court that the Secretary's contention based

5  on Congressional concern with suppliers' fraudulent practices

6  is a non sequitur.

7      Given that Congress designated the vehicle by which

8  suppliers are to provide the information requested by the

9  Secretary to determine medical necessity, and that it took

10 precautionary measures to prevent supplier misconduct, it

11 seems implausible that Congress would allow suppliers to

12 obtain and keep private medical records, second guess

13 physicians' professional conclusions by making medical

14 necessity judgments themselves, and then inform beneficiaries

15 prior to furnishing an item of "the likelihood of Medicare

16 denial of payment."   See A.R. Vol. 1 at 28.   Such

17 requirements would likely lead to the very type of abuse that

18 apparently concerned Congress.   Finally, in this regard, I

19 note that the Secretary's construction raises serious privacy

20 concerns.[21]   A construction raising constitutional questions,

21

22     [21]   Individuals have a right protected under the Due Process
   Clause of the Fifth and Fourteenth Amendments in the privacy of
   personal medical information and records.   Yin v. State of Cal.,
23 95 F.3d 864 (9th Cir. 1996); see also Whalen v. Roe, 429 U.S. 589,
   599 (1977).   Moreover, the Privacy Act, 5 U.S.C. § 552a, provides
24 that, with certain exceptions, "no agency may disclose any record
   which is contained in a system of records . . . except pursuant to
25 a written request by, or with the prior written consent of, the
   individual to whom the record pertains . . . ."   5 U.S.C. §
26 552a(b); See also Cal. Civ. Code § 56.10(C) (requiring health care

1  or suggesting statutory conflict is, of course, to be

2  avoided.

3      In a final effort to defend the challenged documentation

4  requirements, the Secretary argues that the plaintiff was

5  required to obtain medical records because the current CMN

6  does not request enough information to provide information as

7  to all of the medical necessity criteria for motorized

8  wheelchairs.  Def's Br. in Supp. of Mot. for Summ. J. at 17.

9  According to the MAC, the CMN alone would not have allowed

10 CIGNA to determine the medical reasonableness of the

11 wheelchairs because the document fails to "solicit

12 information concerning all the coverage criteria."  A.R. Vol.

13 1 at 30.  Specifically, the MAC explained that, "although the

14 coverage manual states that the patient's condition must be

15 such that without the use of a wheelchair, the patient would

16 otherwise be bed or chair confined, there is no question on

17 the CMN that specifically addresses this coverage element."

18 Id.  The Secretary further argues that, because plaintiff was

19 on notice of all of the coverage elements and the CMN did not

20 inquire regarding all of them, it should have known that it

21 needed to supply medical documentation in addition to the

22 ////

23 ////

24 ////

25

26 providers to hold a patient's medical information confidential
   unless the information falls under an enumerated exceptions).

1 CMN.[22]

2       The MAC is correct that the CMN used during the time in

3 question, and currently in effect, DMERC form 2.03 A, does

4 not make inquiries regarding all of the medical necessity

5 criteria for motorized wheelchairs. See A.R. Vol. 4 at 860.

6 That form asks only seven questions regarding the

7 beneficiary's medical condition and does not inquire whether

8 the patient would be bed or chair confined without a

9 motorized wheelchair, a criterion that must be met for a

10 wheelchair to be considered medically necessary for the

11 beneficiary. Id. at 860.  The Secretary essentially argues

12 that his response to this "practical dilemma" is to require

13 _____

14       [22]  According to 42 C.F.R. § 411.406(e)(1)), a supplier
will be presumed to know that an item was not reasonable and
15 necessary where the supplier has received relevant CMS
notices, including manual issuances or other written guides
16 from the Medicare carrier.  42 C.F.R. § 411.406 provides
that:
17
(e) Knowledge based on experience, actual notice, or
18 constructive notice. It is clear that the provider,
practitioner, or supplier could have been expected to have
19 known that the services were excluded from coverage on the
basis of the following:
20 (1) Its receipt of CMS notices, including manual issuances,
bulletins, or other written guides or directives from
21 intermediaries, carriers, or QIOs, including notification of
QIO screening criteria specific to the condition of the
22 beneficiary for whom the furnished services are at issue and
of medical procedures subject to preadmission review by a
23 QIO.
(2) Federal Register publications containing notice of
24 national coverage decisions or of other specifications
regarding noncoverage of an item or service.
25 (3) Its knowledge of what are considered acceptable standards
of practice by the local medical community.
26

1  suppliers to obtain other medical documentation to provide

2  proof of whatever criteria are not addressed in the CMN.

3       Although courts may go beyond the plain meaning of a

4  statute if it leads to an "impracticable consequence," the

5  problem complained of here is not a consequence of the

6  statute, but of CMS' drafting of the CMN.  As I now explain,

7  because the "problem" is self-created and easily remedied, a

8  proper construction of the statute does not at all produce an

9  impracticable result, and the plain meaning must be honored.

10  See Avendano-Ramirez v. Ashcroft, 365 F.3d 813, 816 (9th Cir.

11  2004).  That CMS has elected to limit the questions on the

12  CMN does not mean that it is incapable of soliciting all of

13  the necessary information required to make a medical

14  necessity determination based on all the coverage criteria.

15  Indeed, a prior version of the form demonstrates that CMS is

16  capable of meeting Congress' directive by obtaining all of

17  the required medical necessity information on a CMN.  That

18  version, DMERC form number 2.01, contained twenty questions

19  covering a wide variety of medical coverage elements,

20  including whether the patient would otherwise be bed or chair

21  confined.  Decl. of Tom Lambert, Exh. A.  The solution to the

22  current gap between medical necessity coverage criteria and

23  the information solicited on the CMN is not to impose an

24  impermissible requirement that the supplier obtain and review

25  medical records, but to use a CMN similar to DMERC form

26  number 2.01, seeking that information from the physician.

1  The Secretary cannot rest on a self-created problem to
2  justify ignoring the plain words of the statute.

3      For the foregoing reasons, the court concludes that the
4  plain language § 1395m(j)(2)(A)(i) supports the plaintiff's
5  position that it may only use a CMN to provide the necessary
6  information for the determination of medical necessity and
7  reasonableness.  The Secretary cannot require that DME
8  suppliers, such as plaintiff, obtain Medicare beneficiaries'
9  medical records and make a judgment as to whether the
10 equipment is medically necessary and reasonable.  It is clear
11 from the plain text of the Medicare Act that, while Congress
12 granted the Secretary broad discretion over medical necessity
13 and billing criteria and procedures, it did not do the same
14 regarding medical necessity documentation.  Instead, Congress
15 addressed that issue itself and established that any and all
16 information required from suppliers to make a medical
17 necessity determination must be contained in a CMN.  Because
18 the MAC's conclusion, and the Secretary's contentions,
19 conflict with the plain language of the Medicare Act,
20 plaintiff's motion for summary judgment must be granted.
21 ////
22 ////
23 ////
24 ////
25 ////
26 ////

**V.**

**CONCLUSION**

For the foregoing reasons, the court hereby ORDERS as follows:

1.    Plaintiff's motion for summary judgment and permanent injunction is GRANTED;

2.    Defendant, and his agents, officers, employees, representatives, and all persons acting in concert or participating with him, are ENJOINED from recouping, offsetting or otherwise collecting from plaintiff any alleged overpayments for any of the beneficiaries which are the subject of this action from any amounts due and owing to plaintiff; and

3.    Plaintiff is directed to SUBMIT a proposed judgment, including the amount of judgment and supporting calculations and documents, within twenty (20) days from the date this order is filed.  Defendant shall file a statement of non-opposition or an opposition to the amounts set forth in the plaintiff's proposed judgment within twenty (20) days after the date recorded on the proof of service to the proposed judgment.

IT IS SO ORDERED.

DATED: June 28, 2004.

LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT

United States District Court
for the
Eastern District of California
June 30, 2004

* * CERTIFICATE OF SERVICE * *

2:03-cv-01584

Maximum Comfort Inc

v.

Secretary of Health

_____

I, the undersigned, hereby certify that I am an employee in the Office of
the Clerk, U.S. District Court, Eastern District of California.

That on  June 30, 2004, I SERVED a true and correct copy(ies) of
the attached, by placing said copy(ies) in a postage paid envelope
addressed to the person(s) hereinafter listed, by depositing said
envelope in the U.S. Mail, by placing said copy(ies) into an inter-office
delivery receptacle located in the Clerk's office, or, pursuant to prior
authorization by counsel, via facsimile.

Bartley S Fleharty           AR/LKK (2)
Wells Small and Selke
P O Box 991828
292 Hemsted Drive
2nd Floor
Redding, CA  96099-1828

Mark Alan Jones
Jones and Dyer
1800 J Street
Sacramento, CA  95814

Ana Maria Martel
United States Attorney
501 I Street
Suite 10-100
Sacramento, CA  95814

Jack L. Wagner, Clerk

BY: _____
Deputy Clerk